**Jacob EGUIA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–06–01136–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Nov. 20, 2008.

Leora Teicher Kahn, Attorney at Law, Houston, TX, for Appellant.

Jessica A. Caird, Assistant District Attorney, Houston, TX, for Appellee.

Panel consists of Justices TAFT, KEYES, and ALCALA.

## OPINION

ELSA ALCALA, Justice.

Appellant, Jacob Eguia, appeals from a judgment convicting him for capital murder for causing the death of Ruby Elaine Garcia and her unborn child during the same criminal transaction. *See* TEX. PEN. CODE ANN. §§ 19.02(b)(1), 19.03(a)(7)(A) (Vernon Supp.2008). Appellant was sentenced to life in prison, which was the only possible sentence since the State did not seek the death penalty. *See id.* § 19.03(a)(7)(A). In twelve issues, appellant contends that the evidence is legally and factually insufficient to support his conviction, that the trial court erred by denying his request for an instructed verdict of acquittal of capital murder, and that the trial court erred by denying his motion to quash the indictment against him. We conclude the evidence is legally and factually sufficient, the trial court did not err by denying appellant's request for an instructed verdict, and the trial court did not

err by denying his motion to quash. We therefore affirm.

## Background

Ruby Elaine Garcia, complainant, was almost eight months pregnant with her first child. Complainant lived in an apartment with the child's father, Ray Torres, a drug dealer. After a baby shower in her honor, complainant spoke on the telephone to her mother around 10:30 or 11 at night, which was the last contact complainant had with her family.

The next morning, having consumed alcohol and cocaine the night before, appellant and his brother, Isaac Eguia, decided to drive to complainant's house in a red Jeep borrowed from their uncle to purchase more cocaine from Torres. Appellant routinely bought his cocaine from Torres and had a line of credit so he could acquire drugs without money on hand.

According to Isaac, appellant went into Torres's apartment while Isaac fell asleep in the Jeep. Isaac was uncertain as to the time they arrived, but around 8:30 or 9:00 in the morning, a resident of the apartment complex noticed a red Jeep parked near complainant's apartment. She did not see anyone in it.

Around 10:30 in the morning, Torres's sister, Jennifer Marron, attempted to call complainant on the telephone because the two had plans to visit Torres in jail, where he had been for several days. When Marron received no answer, she drove to complainant's apartment. Marron did not become concerned for complainant's safety until her unanswered knocks on complainant's door were followed by a "thump" against the door from within the apartment. Marron then called her mother and complainant's mother. Approximately five minutes later, appellant opened the door. His nose was bleeding and his head was sweaty and bloody. Marron, who knew appellant because they had gone to school together, asked him if he had been in a fight. He answered in the affirmative and tried to coax Marron inside the apartment. As she neared the entrance, she saw that "everything was out of place" and noticed "skidmarks of blood ... like something was drug [sic] across the floor."

Marron backed away from the door, but appellant grabbed her to pull her into the apartment. Fearing for her life, she managed to free herself from appellant's grasp as he tore off her shirt and bra, and then she fled to the opposite end of the apartment complex, where she jumped into an occupied parked car belonging to a woman she did not know. Using the woman's cellular telephone, Marron summoned the police, her mother, and her boyfriend. Complainant's mother and stepfather also arrived.

There are conflicting statements concerning where Isaac was at this time, but he was somewhere near the apartment when complainant's stepfather broke the window adjacent to the front door in order to enter the apartment. Just as the window broke, appellant leapt from the second-story balcony. When she saw appellant, Marron noticed that he had changed out of the red plaid shirt he had been wearing earlier and now had on a gray T-shirt. Marron and her companions punched and kicked appellant and beat him with a metal baseball bat. Meanwhile, complainant's mother and stepfather gained entry into the apartment, where they discovered complainant's deceased body.

Before police arrived, appellant escaped in the Jeep driven by Isaac. Complainant's father ran to his truck to pursue the brothers but could not find them.

After Isaac dropped appellant off at their mother's house, appellant's wife took

him to the hospital for treatment of injuries he had received. A physician's assistant cleaned the blood off appellant's face and treated three lacerations, one on the webbed skin of his right hand where his thumb met his palm and two on the inside of his right leg near his knee. The leg lacerations measured thirty-five and forty-five millimeters in length. The physician's assistant testified that lacerations are usually caused by very sharp instruments like knives or glass. She also remarked that appellant had "a lot of blood all over his body." Officers detained appellant at the hospital.

DNA analysis confirmed, within a statistical probability, that appellant and complainant both had each other's blood on either their person or clothing, and mixtures of their blood were found in numerous locations around the apartment. One police officer testified that during knife attacks, it is common for both the assailant and the victim to be cut and their blood to mix. Except for the master bathroom, police investigators found blood in every room of the apartment. Through DNA analysis, investigators located what was positively identified as complainant's blood on the soles of appellant's feet, the interior front doorknob, a blood-soaked pair of blue jeans, and a seven-inch-long kitchen knife that the assistant medical examiner found tangled in complainant's hair. DNA evidence also showed that appellant's blood was on numerous surfaces, particularly a new baby crib, Marron's clothing, and underneath complainant's fingernails.

Not all of the DNA samples were conclusive. The Medical Examiner's Office and an independent molecular biology firm ran DNA tests on the knife. One of the Medical Examiner's Office's tests could not exclude either appellant or complainant as contributors to the blood on the handle of the knife while the other test indicated that the handle was covered in blood belonging to both appellant and complainant. The independent test conclusively determined that complainant's blood was on both the handle and blade, but the test specifically excluded appellant as a contributor to the DNA sample. The Medical Examiner's Office's test of the blade indicated that appellant's blood contributed to the mixture, but the statistical certainty of this conclusion measured considerably lower than the test indicating the presence of his DNA on the handle.

Examination for DNA evidence was done on the blood-soaked jeans found near the largest pool of blood in the apartment. One of the Medical Examiner's Office's tests conclusively identified complainant's blood on the jeans along with the blood of a person whose DNA profile was not inconsistent with that of appellant. The other test by the Medical Examiner's Office conclusively indicated that both parties' blood soaked into the jeans.

Investigators discovered two cuts in the denim jeans, located on the front of the right pant leg. A police officer testified that these cuts were "relatively in the same size and position" as the lacerations on appellant's leg. Inside the bloody jeans, investigators discovered a wallet containing appellant's driver's license, social security card, credit card, and other personal articles. Appellant's blood was detected on a purse that contained cash. His blood and complainant's fingerprint were also located on a sheet of paper that officers identified as a ledger for drug transactions that listed twenty-nine names, including "Coco," with numbers written next to them. "Coco" was appellant's nickname. Within the apartment, investigators found some cocaine compressed into rocks, a blue pill, some pink powder, $2730 in cash, and, in the master bedroom closet,

approximately twenty-five pounds of marijuana.

Complainant died of blood loss as a result of an incised wound to her neck that severed her right carotid artery and jugular vein. All medical observations indicated that the pregnancy had been progressing normally and that both complainant and her unborn child were healthy prior to complainant's being stabbed. According to the assistant medical examiner, the unborn child failed to be born alive because of the maternal death.

Appellant was indicted for capital murder for intentionally or knowingly causing the death of complainant and her unborn child in the same criminal transaction by cutting complainant with a knife. Before trial, appellant filed three motions to quash the indictment challenging the constitutionality of the Texas Penal Code. The trial court denied the motions. Appellant pleaded not guilty to the jury. The jury convicted appellant of capital murder.

## Sufficiency of the Evidence

Appellant contends in eight issues that the evidence is legally and factually insufficient to support the jury's finding of guilt for capital murder. More specifically, in his first through fourth issues, appellant asserts that the evidence is legally and factually insufficient to support the jury's finding of guilt for the murder of complainant, and in his fifth through eighth issues, he asserts that the evidence is legally and factually insufficient to support the jury's finding of guilt for the murder of complainant's unborn child.

### A. Standard of Review

In a legal sufficiency review, we consider the entire trial record to determine whether, viewing the evidence in the light most favorable to the verdict, a rational jury could have found the accused guilty of all essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Vodochodsky v. State,* 158 S.W.3d 502, 509 (Tex. Crim.App.2005). In conducting our review of the legal sufficiency of the evidence, we do not reevaluate the weight and credibility of the evidence, but ensure only that the jury reached a rational decision. *Muniz v. State,* 851 S.W.2d 238, 246 (Tex.Crim.App. 1993).

When conducting a factual-sufficiency review, we view all of the evidence in a neutral light. *Ladd v. State,* 3 S.W.3d 547, 557 (Tex.Crim.App.1999). We will set the verdict aside only if (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust or (2) the verdict is against the great weight and preponderance of the evidence. *Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Crim.App.2000). Under the first prong of *Johnson,* we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted to acquit had we been on the jury. *Watson v. State,* 204 S.W.3d 404, 417 (Tex.Crim.App.2006). Under the second prong of *Johnson,* we cannot declare that a conflict in the evidence justifies a new trial simply because we disagree with the jury's resolution of that conflict. *Id.* Before finding that evidence is factually insufficient to support a verdict under the second prong of *Johnson,* we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id.* In conducting a factual-sufficiency review, we must also discuss the evidence that, according to the appellant, most undermines the jury's verdict. *See Sims v. State,* 99 S.W.3d 600, 603 (Tex.Crim.App.2003).

6

"Appellate courts should afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility." *Lancon v. State*, 253 S.W.3d 699, 705 (Tex.Crim.App.2008). "The jury is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record." *Id.* The jury "may choose to believe some testimony and disbelieve other testimony." *Id.* at 707.

## B. Elements of Capital Murder

A person commits capital murder when he commits murder under section 19.02(b)(1) of the Penal Code and "murders more than one person . . . during the same criminal transaction." TEX. PEN. CODE ANN. § 19.03(a)(7)(A) (Vernon Supp. 2008). Under Texas Penal Code section 19.02(b)(1), a person commits murder if he "intentionally or knowingly causes the death of an individual." *Id.* § 19.02(b)(1). "A person acts intentionally with respect to . . . a result of his conduct when it is his conscious objective or desire to . . . cause the result." *Id.* § 6.03(a). "A person acts knowingly . . . with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b).

■ In the Texas Penal Code, " '[p]erson' means an individual . . . ."; " '[i]ndividual' means . . . an unborn child at every stage of gestation from fertilization until birth"; and " '[d]eath' includes, for an individual who is an unborn child, the failure to be born alive." *Id.* § 1.07(a)(26), (38), (49). "It follows from these provisions that a person who intentionally or knowingly causes the death of a woman and her unborn child, at any stage of gestation, commits capital murder." *Lawrence v. State*, 240 S.W.3d 912, 915 (Tex.Crim.App. 2007). The statute exempts conduct committed by a woman who chooses to terminate her own pregnancy or by a healthcare provider terminating the pregnancy of a consenting patient. TEX. PEN.CODE ANN. § 19.06 (Vernon Supp.2008).

## 1. Death of Complainant

■ In his first and second issues, appellant asserts that the evidence is legally and factually insufficient to support the jury's finding that he intentionally or knowingly caused complainant's death. Appellant contends that "at best, the evidence supports the undisputed fact that he was present in complainant's blood-soaked apartment immediately prior to her discovery." Appellant contends the DNA laboratory report reveals that appellant's DNA profile was excluded from the knife identified as the weapon used against complainant. Appellant points to the lack of any witnesses to testify that he exhibited or brandished any weapons. He challenges the lack of evidence to show that he cut his hand on the knife, claiming he cut his hand on broken glass as he exited the apartment from the balcony. Additionally, appellant contends there is no evidence of blood splatter on the red shirt he was wearing when complainant was killed. Appellant also asserts he was cooperative with police officers. Appellant suggests someone other than him could have committed the offense, such as the unknown person who called complainant multiple times near the time she was killed and the unknown people who purchased illegal drugs from complainant's apartment.

### a. Legal Sufficiency of Evidence

Viewing the evidence in a light most favorable to the jury's verdict, the record shows that appellant was found inside complainant's apartment shortly before complainant was found dead. Appellant was aggressive toward the person who discovered him in the apartment and fled from the scene when he was discovered there.

See Nunez v. State, 215 S.W.3d 537, 541 (Tex.App.-Waco 2007, pet. ref'd) (citing Harris v. State, 645 S.W.2d 447, 457 (Tex. Crim.App.1983)) (finding that flight from crime scene is circumstantial evidence that points toward guilt). DNA that matched appellant within a statistical probability was found mixed with complainant's DNA in several different rooms throughout the apartment. Furthermore, appellant's wallet was inside a pair of blue jeans that had cuts consistent with the injuries on appellant's leg. A witness testified that appellant's injuries were consistent with injuries received while attacking someone with a knife. The assistant medical examiner explained that complainant died as a result of the laceration to her throat.

We conclude, viewing the evidence in a light most favorable to the jury's verdict, that the jury could rationally find that appellant knowingly caused the death of complainant. See Easley v. State, 986 S.W.2d 264, 271 (Tex.App.-San Antonio 1998, no pet.) (holding evidence legally and factually sufficient to support murder conviction where testimony placed Easley at crime scene, DNA analysis could not exclude his profile from blood found at crime scene, and expert testimony suggested cuts on his hands were accidentally self-inflicted as he knifed victim to death). We overrule appellant's first issue.

Because we have determined the evidence is legally sufficient to show appellant intentionally caused complainant's death, we do not reach the alternative challenges that the evidence is legally insufficient because the evidence does not prove appellant knowingly caused the death of complainant or intended to cause serious bodily injury to complainant. We overrule appellant's third issue.

### b. Factual Sufficiency of Evidence

In his second issue, appellant challenges the factual sufficiency of the evidence to prove that he murdered complainant. Appellant accurately represents that one of the results obtained from the independent laboratory excludes him as the source of the blood found on the knife that was identified as the weapon used against complainant. However, another test on that knife found appellant's DNA profile was not inconsistent with the blood found on the knife. The third test on the knife identified appellant as a contributor to the blood on the knife handle with a statistical certainty of 1 in 7,885,000 Hispanic people and the blood on the knife blade with a certainty of 1 in 125,300 Hispanic people. Due to the disparity of results, the jury may have accepted the results from all, some, or none of these tests. See Lancon, 253 S.W.3d at 707. We also note that the only object subjected to DNA analysis for which the three samples produced inconsistent results was the knife found in complainant's hair.

Appellant accurately points out that no witness testified that he exhibited or brandished any weapons. Although no witness saw him holding a weapon, a witness testified that his injuries to his hand and leg were consistent with injuries received from a sharp object such as a knife. Thus, evidence shows that he was in the proximity of a knife.

Appellant relies on his statement that he cut his hand on broken glass as he exited the apartment from the balcony. However, evidence shows that he was bloody while in the apartment before he jumped from the balcony. Marron described appellant as bloody and sweaty before they fought and testified that she saw the apartment in disarray. She also mentioned that, in addition to a bloody nose, appellant had blood on his forehead and in his hair. We also note that if appellant was injured as he leapt from the balcony, as he claims, that would not explain how

his DNA was mixed with complainant's DNA throughout the many places the blood mixture was found in the apartment. Appellant's DNA was found in most of the rooms in the apartment and on more than twenty different items. Moreover, at trial, appellant offered no explanation for the lacerations on his leg.

Other evidence is also inconsistent with appellant's claim that he was injured on the balcony. The only broken glass that investigators located came from the front window, which is consistent with Marron's father's testimony that he broke the front window of the apartment when he arrived at the scene. Marron's testimony also suggests that appellant did not jump from the balcony until after the glass on the window by the front door was broken. The sequence of events, therefore, would dispute appellant's explanation that any injury to his hand was caused by the window or balcony.

Appellant contends there is no evidence of blood splatter on the red shirt that Marron initially saw him wearing, which investigators located in appellant's wife's car. Appellant asserts the bloodstain pattern on it was inconsistent with the arterial spurt pattern that complainant's severed carotid artery sprayed onto a wall in the apartment. Although no arterial spray appeared on the red shirt, the jury could have reasonably determined that appellant positioned himself out of the way of the spray to avoid the spray, which then hit the wall of the apartment.

Appellant also asserts he was cooperative with police officers and that there could be other possible suspects. Appellant suggests someone other than himself could have committed the offense, such as the unknown person who called complainant seven times in thirteen minutes beginning at 7:01 on the morning the body was discovered, and the unknown people who purchased illegal drugs at the apartment. However, none of the evidence specifically identifies anyone other than appellant as the murderer.

At trial, appellant's theory of the case was that the twelve hours during which no one could account for complainant left a measure of doubt too great for the evidence to prove appellant guilty of murder. The evidence, however, is sufficient for the jury to determine that appellant was guilty of stabbing complainant's throat and intentionally killing her. Investigators found appellant's blood in more than twenty locations, including on and around the apartment's front door, in the kitchen on the counter and on a coffee can, on one of complainant's socks, on the purse that contained most of the cash recovered from the apartment, on an assembled baby crib, on a sheet of paper found on a couch, on the balcony railing, on appellant's clothing, and on Marron's clothing. Blood that came from both appellant and complainant saturated the pair of blue jeans found in the apartment that contained appellant's wallet. Investigators found the jeans near the largest pool of blood in the apartment, and it appears someone dragged complainant's body from that pool toward the front door where she was found. The correlation between the cuts in the jeans and the lacerations on appellant's leg support the inference that he wore those jeans when his leg was cut. The physician's assistant, who treated appellant at the hospital, specifically tended to appellant's wounds, indicating that the lacerations had been inflicted recently. Combined with police testimony that knife-wielding assailants often cut themselves as well as their victims, and evidence that the lacerated appellant was at the scene of the knife-related murder of complainant, the evidence supports the conclusion that appellant incurred his lacerations while stabbing complainant.

Before fleeing the scene, he changed out of his bloodied clothes, leaving his wallet inside his pants. Even if the DNA laboratory report that excludes appellant as a contributor to the blood on the knife is accurate, the other evidence—such as the recovery of DNA evidence throughout the apartment, appellant's wallet in the blue jeans, the physical injuries to appellant's body, and appellant's behavior by fleeing the scene of the crime—shows appellant's guilt for the murder of complainant.

Providing due deference to the jury's weighing of the evidence, we conclude that a neutral examination of the evidence shows that the evidence is not so weak that the jury's holding is clearly wrong or manifestly unjust and that the determination of guilt is not against the great weight and preponderance of the evidence. *See Johnson*, 23 S.W.3d at 11; *see also Easley*, 986 S.W.2d at 271. We hold the evidence is factually sufficient to support the jury's determination that appellant murdered complainant by intentionally causing her death. *See Johnson*, 23 S.W.3d at 11. We overrule appellant's second issue. We overrule issue four for the same reasons we overrule issue three.

## 2. Death of Complainant's Unborn Child

In his fifth through eighth issues, appellant contends that the evidence is legally and factually insufficient to show that he intentionally or knowingly caused the death of complainant's unborn child. Appellant contends the evidence is legally and factually insufficient to prove that appellant knew complainant was pregnant, that he intended to cause the death of the unborn child, or that he was subjectively aware that his actions were reasonably certain to cause the result. Appellant asserts that the State did not prove that he had any knowledge of complainant's pregnancy and that it would have been impossible for him to deduce that complainant was pregnant because she wore loose-fitting clothes that hid her protruding abdomen.

Appellant emphasizes that the State did not introduce evidence demonstrating he intentionally caused complainant's unborn child not to be born alive since complainant's abdomen was uninjured. But we need not determine whether appellant acted intentionally because his guilt for the murder of complainant's unborn child may be sustained by evidence that he knowingly caused the death of the unborn child, which means that he was aware that his conduct was reasonably certain to cause the unborn child to fail to be born alive. *See* TEX. PEN.CODE ANN. §§ 1.07(a)(26), (38), (49), 6.03(a), 19.02(b)(1) (Vernon Supp. 2008); *Lawrence*, 240 S.W.3d at 915.

### a. Legal Sufficiency of Evidence

Viewing the evidence in a light most favorable to the jury's verdict, the evidence shows that appellant stabbed complainant's mother while she was four to six weeks from a full-term pregnancy. By that conduct, according to the medical examiner, appellant caused the death of both complainant and the unborn child, who was otherwise healthy.

Evidence showed that complainant appeared pregnant. In a photograph of her taken approximately one month before she died, complainant was noticeably pregnant. The autopsy report also noted her protruding abdomen, and complainant's protruding abdomen is easily visible in the crime scene and autopsy photographs. Moreover, the apartment had the crib and other baby-related items strewn throughout it. We conclude that a rational jury could find that appellant knew complainant was in the later stages of pregnancy and that stabbing her would cause her unborn child to fail to be born alive. We hold the evidence is legally sufficient to prove ap-

pellant knowingly caused the death of complainant's unborn child. We overrule appellant's seventh issue.

Having determined the evidence is legally sufficient to show that appellant knowingly caused the death of the unborn child, we do not reach appellant's fifth issue that alternatively challenges the evidence the appellant committed an act clearly dangerous to human life by cutting the mother with a deadly weapon. We overrule appellant's fifth issue.

### b. Factual Sufficiency of Evidence

In his sixth and eighth issues, appellant maintains that the evidence is factually insufficient to prove that he murdered complainant's unborn child. Appellant claims there is a lack of evidence to show that he knew complainant was pregnant. Appellant points to his brother's testimony that appellant never mentioned or verbally acknowledged complainant's pregnancy. However, the jury could have determined that the brother lacked credibility and disregarded the testimony, or it could have determined that no comment about the pregnancy was necessary since it was obvious complainant was pregnant due to her physical appearance. *See Lancon*, 253 S.W.3d at 707.

The jury had before it photographs that showed complainant's protruding abdomen when she was killed, as well as common knowledge about the appearance of a woman who is near a full-term pregnancy. We also note that the apartment had many items that a pregnant mother would have and that were readily apparent to appellant. The unwrapped baby gifts complainant had just received at her baby shower were in a large open bag just inside the front door. Investigators found appellant's blood smeared on a support rail for a fully assembled crib. We conclude the jury could have reasonably determined appellant knew complainant was nearly full

term in her pregnancy based on her physical appearance.

Without formally challenging the jury instructions and without citing authoritative support, appellant asserts that the jury received an instruction to "*presume that Appellant* [sic] *was aware of complainant's pregnancy because of his continuing interactions with her*" (emphasis added). On the contrary, the trial court instructed the jury to "consider the evidence of all relevant facts and circumstances surrounding the deaths and the previous relationship, *if any*, existing between [appellant] and [complainant]" (emphasis added). Thus, the jury was allowed to consider all the evidence pertaining to any relationship between complainant and appellant.

Viewing all the evidence neutrally, we conclude it is factually sufficient to sustain the jury's finding of guilt for knowingly causing the death of complainant's unborn child because it is not so weak that the verdict is wrong or manifestly unjust and the verdict is not against the great weight and preponderance of the evidence. *See Johnson*, 23 S.W.3d at 11. We overrule appellant's eighth issue. We overrule appellant's sixth issue for the same reason we overrule the fifth issue.

Appellant did not challenge the jury's finding that the murders occurred in the same criminal transaction. We hold the evidence legally and factually sufficient to support the jury's finding of guilt for capital murder.

### Instructed Verdict

In his ninth issue, appellant contends that, because the evidence was legally and factually insufficient to support the jury's finding of guilt, the trial court erred by denying his request for an instructed verdict of acquittal. We construe a challenge to a trial court's denial of a motion

for instructed verdict as a challenge to the legal sufficiency of the evidence. *See Canales v. State,* 98 S.W.3d 690, 693 (Tex. Crim.App.2003). Having held the evidence to be legally sufficient, we hold the trial court did not err by denying appellant's request for an instructed verdict of acquittal. *See Robinson v. State,* 817 S.W.2d 822, 823–24 (Tex.App.-Fort Worth 1991, pet. ref'd); *Bell v. State,* 747 S.W.2d 898, 900–01 (Tex.App.-Fort Worth 1988, pet. ref'd). We overrule appellant's ninth issue.

### Motion to Quash the Indictment

In his tenth through twelfth issues, appellant contends that the trial court erred by denying his motions to quash the indictment against him for causing the death of complainant and her unborn child because the Texas statute that defines an unborn child as a "person" for purposes of the capital murder statute is unconstitutional.

### A. Standard of Review

■■■■ When reviewing a trial court's decision to deny a motion to quash an indictment, we apply a *de novo* standard of review because the trial court is not in a better position than the appellate court to make that determination. *Lawrence,* 240 S.W.3d at 915 (citing *State v. Moff,* 154 S.W.3d 599, 601 (Tex.Crim.App.2004)). When evaluating the constitutionality of a statute, we initially presume the legislature has not acted unconstitutionally and the statute is valid. *Rodriguez v. State,* 93 S.W.3d 60, 69 (Tex.Crim.App.2002) (citing *Ex parte Granviel,* 561 S.W.2d 503, 511 (Tex.Crim.App.1978)). The party challenging the statute has the burden of establishing its unconstitutionality as applied to him, and in the absence of evidence supporting the challenge, the presumption of constitutional validity remains in force. *Id.*; *Vuong v. State,* 830 S.W.2d 929, 941 (Tex.Crim.App.1992) (citing *Parent v.*

*State,* 621 S.W.2d 796, 797 (Tex.Crim.App. 1981)).

### B. First Amendment Challenge

■■ Appellant asserts that the Texas Penal Code definition of "individual" violates the First Amendment of the United States Constitution and Section Four of Article One of the Constitution of the State of Texas. *See* U.S. CONST. amend. I; TEX. CONST. art. I, § 4; TEX. PEN.CODE. ANN. § 1.07(a)(26) (Vernon 2007). Because he bases both of those challenges on the Establishment Clause, it appears appellant is challenging the statute under Article One, Section Six, of the Constitution of the State of Texas, which was previously codified under Section Four. TEX. CONST. art. I, § 6. Appellant asserts that the State's definition of "individual" "has the effect of endorsing religion as it is based solely upon a religious belief that life begins at conception."

The Establishment Clause of the First Amendment of the United States Constitution prohibits Congress from making any law "respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. CONST. amend. I. This prohibition extends to state legislatures via the Fourteenth Amendment. *Id.* at amend. XIV; *Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 301, 120 S.Ct. 2266, 2275, 147 L.Ed.2d 295 (2000). The Texas equivalent of the Establishment Clause states, in part, that "no preference shall ever be given by law to any religious society or mode of worship." TEX. CONST. art I, § 6; *see HEB Ministries, Inc. v. Tex. Higher Educ. Coordinating Bd.,* 235 S.W.3d 627, 642 (Tex.2007) (finding federal and Texas clauses to be coextensive in application); *see also Williams v. Lara,* 52 S.W.3d 171, 186 (Tex.2001) (implying analyses for federal and Texas clauses are identical). Thus, no legislature may en-

dorse a religion by enacting a law that supports a religious organization's religious message. *See County of Allegheny v. ACLU Greater Pittsburgh Chapter,* 492 U.S. 573, 600–01, 109 S.Ct. 3086, 3104–05, 106 L.Ed.2d 472 (1989).

■ A statute does not violate the Establishment Clause if (1) the statute has a secular purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) it does not foster excessive government entanglement with religion. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). Concerning the first *Lemon* factor, the State has a legitimate secular interest in protecting mothers and their unborn children throughout the mother's pregnancy. *Planned Parenthood of S.E. Pa. v. Casey,* 505 U.S. 833, 846, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674 (1992); *see also Webster v. Reproductive Health Servs.,* 492 U.S. 490, 519, 109 S.Ct. 3040, 3057, 106 L.Ed.2d 410 (1989) (holding State has legitimate interest in protecting potential human life); *Roe v. Wade,* 410 U.S. 113, 162, 93 S.Ct. 705, 731, 35 L.Ed.2d 147 (1973) (holding State has legitimate interest in protecting lives of pregnant women and human life generally). We conclude the definition of "individual" serves the State's legitimate secular interest in protecting unborn children from the criminal acts of others. *See Casey,* 505 U.S. at 846, 112 S. Ct. at 2804; *Flores v. State,* 215 S.W.3d 520, 528 (Tex.App.-Beaumont 2007, no pet.).

A statute is not automatically rendered unconstitutional simply because it advances ideals that harmonize with religious ideals. *Harris v. McRae,* 448 U.S. 297, 319–20, 100 S.Ct. 2671, 2689, 65 L.Ed.2d 784 (noting that Judeo–Christian religions' forbiddance of stealing does not preclude state or federal legislatures from outlawing larceny). Concerning the second and third *Lemon* factors, appellant fails to demonstrate how the statute's principal or primary effect advances religion, or how the statute fosters excessive government entanglement with religion. The statute complies with all three prongs of the *Lemon* test. *See Lemon,* 403 U.S. at 612–13, 91 S.Ct. at 2111; *see also Flores,* 215 S.W.3d at 528. We hold the statute is valid under the Establishment Clause of the Constitutions of the United States and the State of Texas. We overrule appellant's tenth and eleventh issues.

## C. Eighth Amendment Challenge

■ Appellant asserts that the definition of "individual," when combined with the definition of "death," violates the Eighth Amendment of the United States Constitution. *See* U.S. CONST. amend. VIII; TEX. PEN.CODE ANN. § 1.07(a)(26), (49) (Vernon 2003). Appellant maintains that, by redefining "individual" to include an unborn child and "death" to include the failure of an unborn child to be born alive, the legislature has effectually created a new aggravating factor to warrant a capital murder charge without actually drafting it into the capital murder statute. Specifically, he asserts that because "the Texas Legislature [sic] has effectively made any non-consensual termination of a pregnancy eligible for a capital murder charge" without writing it into the capital murder statute, the statute is unconstitutional.

The Eighth Amendment of the United States Constitution, which applies to the states via the Fourteenth Amendment, states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. The legislature has the sole responsibility for defining crimes and their corresponding punishments. *Matchett v. State,* 941 S.W.2d 922, 932 (Tex.Crim.App.1996) (citing *Granviel,*

561 S.W.2d at 515; *State ex rel. Smith v. Blackwell,* 500 S.W.2d 97, 104 (Tex.Crim. App.1973)). For that reason, the legislature may expand the list of aggravating factors that justify a capital murder charge. *Id.* Appellant offers no support for his argument that, by expanding the definitions of "person" (through the definition of "individual") and "death," the legislature has violated the constitution.

The only authority appellant cites is *Furman v. Georgia,* which held that arbitrary, inconsistent, and discriminatory imposition of the death penalty violates the Eighth and Fourteenth Amendments. *Furman v. Georgia,* 408 U.S. 238, 239–40, 92 S.Ct. 2726, 2727, 33 L.Ed.2d 346 (1972). But Texas's capital murder scheme, which requires a jury to find a defendant guilty if it finds at least one of the enumerated aggravating circumstances present, has been held constitutionally valid because "this system serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed...." *Vuong,* 830 S.W.2d at 941 (citing *Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976)). The aggravating circumstance that allows for the imposition of capital punishment when the defendant commits multiple murders in the same criminal transaction sufficiently narrows the class of murderers who may be charged. *Vuong,* 830 S.W.2d at 941. The legislature further narrowed the class of murderers who may be charged by specifically excluding "conduct committed by the mother of an unborn child" and "a lawful medical procedure performed by a physician or other licensed health care provider with the requisite consent, if the death of the unborn child was the intended result of the procedure" or if the procedure was "part of an assisted reproduction." Tex. Pen.Code Ann. § 19.06 (Vernon Supp. 2008).

When the legislature changed the definitions, it also added section 19.06 to the Penal Code, which provides several ways in which a person can legally cause an unborn child to fail to be born alive. *Id.* § 19.06. The legislature appears to have surveyed the Penal Code and made all the changes it deemed necessary to include unborn children in the definitions of terms in the penal code. Moreover, the definition of "individual" has been upheld against an Eighth Amendment challenge on the grounds of vagueness. *See Lawrence,* 240 S.W.3d at 915–16. We hold the definitions of "individual" and "death" do not violate the Eighth Amendment of the United States Constitution. We overrule appellant's twelfth issue.

### Conclusion

We affirm the judgment of the trial court.