

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-14-00412-CR

THOMAS OLIVAS                                                        APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 1376698R

----------

## DISSENTING OPINION

----------

I must begin my dissent by recognizing the conscientious and scholarly commitment of the majority to follow the law. I express my disagreement with the majority based solely on the record before us, in full recognition of the highest standards of integrity to which the majority is fully committed.

I must ask, have we learned nothing from Cameron Todd Willingham?[1] From Michael Morton?[2] The fact that a person could have committed a heart-wrenching crime is not evidence that would allow a jury to find from the evidence beyond a reasonable doubt that he did commit that crime, as our state and federal law requires.[3] Willingham, Morton, and an unsettling number of other persons have been convicted, not because of intended prosecutorial misconduct, but because the investigation centered exclusively on them early on and sloppy pseudo-scientific investigation showed the possibility of their guilt.[4] In recent years we have discovered that "scientific evidence" we have relied on to justify criminal convictions has been repudiated by scientists. In many of these cases, the investigation focused on a single individual from the beginning, and the junk science was the "objective evidence" that supported the other evidence that often amounted to little or no more than suspicion.

---

[1]*See* David Grann, *Trial by Fire: Did Texas Execute an Innocent Man?* New Yorker: A Reporter at Large (Sept. 7, 2009), http://www.newyorker.com/magazine/2009/09/07/trial-by-fire (last visited Dec. 28, 2016).

[2]*See* Michael Morton, *Getting Life: An Innocent Man's 25-Year Journey from Prison to Peace* (2014).

[3]*See* Tex. Code Crim. Proc. Ann. art. 38.03 (West 1979); Tex. Penal Code Ann. § 2.01 (West 2011); *Jackson v. Virginia*, 443 U.S. 307, 317–18, 99 S. Ct. 2781, 2788 (1979).

[4]*See Ex parte Robbins*, 478 S.W.3d 678, 691–92 (Tex. Crim. App. 2016) (granting habeas relief based on newly available scientific evidence); California Innocence Project, *Update: William Richards Released on June 21, 2016!*, Freed Clients, https://californiainnocenceproject.org/read-their-stories/william-richards/ (discussing reversal of William Richards's conviction of killing his wife based on bite-mark evidence) (last visited Dec. 28, 2016).

Although no hair or DNA of Appellant was found on the scene, while hair and unidentified male DNA was found, the investigation in this case, just as in the Morton and the Willingham cases, focused only on a single person and relied in whole or in part on suspect scientific evidence  The case now before this court relies on the following evidence:

Appellant said he hated Mother because she was going to court to force him to pay child support.  He said he was going to see her that night, and he said he did not see her that night.  His girlfriend Raudry broke up with him because of Mother and Child.  He had scratches on his body.  A witness saw a person in a hoodie in the area of Mother's apartment near the time the fire broke out. Appellant liked hoodies.  The borrowed car Appellant drove smelled of gasoline. Investigators opined there was gasoline on Mother's shorts and on Child.  But mostly they "proved" Appellant was near Mother's apartment near the time of the fire because his cell phone pinged off cell towers.

The Arlington Fire Department received a 9-1-1 call on Sunday, March 20, 2011, just after 10:00 p.m., reporting a fire at an apartment complex.  There was testimony that a mother (Mother) and child (Child) died in the fire and that gasoline had been used as an accelerant, although Tarrant County Medical Examiner Dr. Peerwani testified that neither Mother nor Child showed evidence of smoke inhalation.  Mother was stabbed multiple times, and Child died of an undetermined form of violence.  That is, neither Mother nor Child was killed by the fire.  But the emphasis of the evidence appears to have been concentrated

3

on gasoline. Appellant was the purported father who did not want to submit to paternity testing and did not want to pay child support.

The majority states that "[t]he dissent emphasizes that neither decedent showed evidence of smoke inhalation and therefore neither was killed by the fire yet stresses that the majority inexplicably concentrates on the gasoline. Common sense dictates we recognize gasoline as a critical connector, the signature element which ties appellant to the murder scene."[5] Obviously, my concerns are not artfully expressed. The medical evidence showed that both Mother and Child were killed before the fire had reached a level that would cause them to inhale smoke. That means Mother was alive when she was stabbed. It is logical that eleven stab wounds to a living adult would produce blood spatter that would reasonably spatter onto the assailant. If gasoline is "a critical connector, the signature element which ties appellant to the murder scene,"[6] that signature connects to every person who operates a motor vehicle. There is no evidence of a gasoline container connected to Appellant. There was a mention of an odor of gasoline in the borrowed car, but scientific testing dispelled the speculation that the odor was produced by gasoline. There was no mention of the odor or presence of gasoline on Appellant's clothing or shoes.

Jim Swindell, who managed the State Fire Marshal's Arson lab during the investigation of this case, testified that of all the items he tested, only Mother's

---

[5]Majority Op. at 3–4.

[6]*Id.* at 4.

4

white shorts and two remnants of clothing found on Child tested positive for gasoline. No other accelerant was the subject of testing or testimony. Patricia Eddings of the Tarrant County Medical Examiner's Office testified about hairs found on Mother's body. Some hairs were similar to Mother's, and some were similar to an unknown third person. No hairs were similar to Appellant's. The hairs were compared to those of no one other than Appellant. Tests for blood and DNA in Mother's apartment were difficult because of the fire, but some items did test positive for Mother's DNA and "the minor presence of male DNA" that could not have come from Appellant or Child.[7] Kelly Belcher, also of the Tarrant County Medical Examiner's Office, examined Mother's body and Child's body for trace evidence. She also took fingernail clippings from Mother. Although Appellant's body had many scratches, there was no report of the result of any testing of Mother's fingernail clippings. There is a suggestion that DNA under the fingernails would not survive the fire. The hair of the unidentified person and DNA of an unidentified male did survive, however. Belcher testified that Mother's shorts smelled like gasoline and described Mother's stab wounds. Witnesses testified to a strong gasoline smell emanating from the car Appellant was driving. Yet when the areas smelling of "gasoline" were tested, they tested negative for gasoline. There was speculation that the tests were negative because police who investigated the interior of the vehicle must not have known how to properly preserve the evidence.

[7] *Id.* at 47.

5

There was evidence that Mother was using her cell phone and her computer around 9:00 p.m. on the day of the murders. FBI special agent Sedwick testified that he had tracked Appellant's cell phone on the day of the murders. Sedwick claimed that Appellant's phone was in Arlington near the intersection of Lamar Boulevard and Collins Street around 6:11 p.m. Six minutes later, according to Sedwick, Appellant's phone was within three quarters of a mile of a cell tower "that covers an area that includes the murder location." Specifically, Sedwick said that the cell tower was "[a]pproximately .4 miles" away from Mother's apartment.

Sedwick said that the data demonstrated that Appellant's phone was involved in a series of texts and calls from 6:20 p.m. to 6:36 p.m. at this same tower. The data also showed that Appellant's phone was in the same geographical area initiating calls and texts to and receiving calls and texts from Mother's phone between 7:03 p.m. and 9:22 p.m. Sedwick also testified that there was a call from Mother to Appellant at 7:10 p.m., but no further communication between the two cell phones until Appellant texted Mother at 10:07 p.m. Sedwick testified that later, between 11:37 p.m. on March 20 and 5:30 a.m. on March 21, Appellant's phone was in the vicinity of his apartment in Grapevine.

We have dealt with cell tower testimony in the past. In *Winningham v. State*, Texas Ranger Tracy Murphree obtained an arrest warrant based in part on his statement that the defendant had made a cell phone call to the complainant

6

from a location "in close proximity to her house."[8]  At trial, however, he conceded that he could tell only that the call had been made somewhere in Arlington but not which cell tower handled the call or how close to the complainant's house the cell phone was when the call was made.[9]

"General area" and "vicinity" are words that tell us nothing.  There is no evidence of the coverage area of any of the cell towers mentioned by Sedwick or where in relation to the cell tower, for example, .5 miles south/southeast of the tower, either cell phone was located.

Most important, the scientific reliability of cellphone tower evidence is being challenged in several states of the United States.  The Connecticut Supreme Court is considering the issue of whether such evidence is mere junk science.[10]  State courts in Maryland, Oregon, and Illinois, as well as federal circuit courts, are questioning whether cellphone tower evidence is reliable or merely junk science.[11]  Michael Cherry, chief executive of Cherry Biometrics, in Falls Church, Virginia, who has testified in successful cases to free people who were imprisoned based in part on cell tower evidence, has explained that the

---

[8]*Winningham v. State*, 334 S.W.3d 289, 317 (Tex. App.—Fort Worth 2010, pet. ref'd) (Dauphinot, J., dissenting).

[9]*Id.*

[10]Dave Collins, Associated Press, *Connecticut Case Challenges Use of Cellphone Tower Evidence* (Dec. 11, 2016), https://yahoo.com/news/connecticut-case-challenges-cellphone-tower-evidence-143700641.html (last visited Dec. 28, 2016).

[11]*Id.*

location of the cell tower does not reflect the location of the cell phone. The cell phone does not go to the nearest tower. Rather, it goes to the clearest tower within range.[12] Cherry explained, "You could be sitting on your living room couch and you could make four phone calls and each call would use a different tower."[13] Cellphone tower evidence requires highly qualified experts testifying to both the reliability and the relevance of cell tower evidence. No such expert testified in the case now before this court.

Appellant had scratches on his body including in areas that would have been covered by a shirt and claimed that he scratched himself because of a skin disease. Others said that he had no skin disease, but no one offered evidence of the age of the scratches. Nor was there evidence of any cuts on his body, although we are repeatedly provided with explanations that knife-wielding assailants often get the victim's blood on themselves and cut themselves because the blood makes the knife slippery.[14] No evidence of Mother's blood or DNA was found in Appellant's apartment.

What objective evidence is there of Appellant's guilt? He avoided Mother and said that he hated her, he did not want to pay child support, and he told lies. His girlfriend Raudry, with whom he had a daughter, found out about Mother and Child, and there is evidence that Mother emailed Raudry to tell her that Mother

---

[12]*Id.*

[13]*Id.*

[14]*See, e.g., Eguia v. State*, 288 S.W.3d 1, 8 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

8

and Appellant were a couple. Raudry got mad at Appellant and left him. He denied that any physical violence occurred during the breakup.

The State bears the burden of proving Appellant's guilt beyond a reasonable doubt.[15] That is the highest burden of proof recognized by our law.[16] Clear and convincing evidence is not proof beyond a reasonable doubt.[17] But here, we do not even have clear and convincing evidence. If anything, we have evidence that Appellant could have committed these acts, but we must disregard the foreign hair found on Mother's body, the unidentified male DNA in her apartment, the total absence of anything to connect Appellant to Mother's apartment, and the absence of any of Mother's DNA in Appellant's apartment or any vehicle connected to him, despite the fact that he in all reasonable probability would have had a large amount of blood on him had he inflicted eleven "personal and brutal" vicious stab wounds on Mother's torso.

The evidence connecting Appellant to the murders is the fact that he did not want to pay child support; evidence of a beefy individual near Mother's apartment in a hoodie with no mention of gender, race, or even the color of the hoodie; the odor of gasoline; and cellphone tower evidence offered with no scientific support or predicate. The front door of Mother's apartment was locked with a deadbolt. It could only have been engaged from inside the apartment. Pry

---

[15]See *Jackson*, 443 U.S. at 309, 99 S. Ct. at 2784.

[16]See *Fuller v. State*, 363 S.W.3d 583, 587–88 & n.28 (Tex. Crim. App. 2012).

[17]See *id.*

marks on the back door of Mother's apartment indicated the apartment's back door was pried open, although it could have been pried open by firemen.

A civil case requires only proof by a preponderance of the evidence, yet in a civil medical malpractice case, "[e]ven if an expert uses the phrase 'reasonable probability,' the evidence is not sufficient when the substance of the expert testimony raised only mere possibilities, speculation, and surmise."[18] In the case sub judice, we have nothing more than evidence that Appellant is not a stand-up guy and could have committed the offense. How this evidence rises to proof beyond a reasonable doubt is beyond not only my comprehension but even my imagination.

I must therefore respectfully dissent from the majority opinion.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PUBLISH

DELIVERED: December 30, 2016

---

[18]*Miller v. Mullen*, No. 06-15-00059-CV, 2016 WL 3475653, at *8 (Tex. App.—Texarkana June 24, 2016, no pet.).