

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-23-00200-CR

———————————————————

SIMEON BONILLA-RUBIO, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 158th District Court
Denton County, Texas
Trial Court No. F21-1926-158

---

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant Simeon Bonilla-Rubio appeals his conviction for capital murder after a jury found him guilty of shooting and killing his pregnant girlfriend and their unborn child. *See* Tex. Penal Code Ann. § 19.03(a)(7)(A). In two issues, Appellant argues that (1) the trial court erred by failing to qualify the jury under Article 35.12 of the Texas Code of Criminal Procedure and (2) the evidence is insufficient to support his capital-murder conviction because it did not show that he intentionally or knowingly caused the death of the unborn child.[1]

We affirm.

## I. Background

On April 28, 2021, Appellant and his girlfriend, Cassity, who was pregnant with their unborn child, were in the car traveling on I-35 in Denton. Cassity drove the car while Appellant sat in the passenger's seat. According to Appellant, they had been arguing and Cassity was angry. He claimed that Cassity was so angry that she retrieved a gun from the space between Appellant's seat and the center console and aimed it at him—all while driving down the highway at seventy miles per hour. Believing that she was going to shoot him, Appellant took the gun from Cassity, aimed it at her, and shot her three times in her neck.

---

[1] Appellant does not challenge his role in the murder of his girlfriend, only his role in the murder of an additional person—their unborn child—during the same criminal transaction. *See* Tex. Penal Code Ann. § 19.03(a)(7)(A).

After he shot Cassity, Appellant managed to bring the car to a stop by using the parking brake. He then pulled Cassity's limp body from the driver's seat, over the center console, and into the passenger's seat. He got into the driver's seat, but before he could drive away, Cassity's body started to fall out of the car on the passenger's side. Appellant responded by picking Cassity up by her hair, "thr[owing] her back into the car," and calling her a "fucking bitch." He then shut the passenger's side door, got back into the driver's seat, and sped off at a high rate of speed with Cassity's body "slumped over" on the passenger's side.

Appellant did not get very far before he crashed the car into the highway median. Unable to open the driver's side door, he climbed over Cassity's body to exit the car from the passenger's side. Appellant then ran away from the scene of the crash, abandoning Cassity's lifeless body and the car. He was gone by the time first responders arrived at the scene. Cassity ultimately died from her injuries; her unborn child did not survive.

Appellant fled to Dallas, where he was later arrested by the police. While he initially denied knowing Cassity or being involved in her death, at trial, Appellant testified that he had been dating and living with Cassity, that she had been pregnant, and that he was with her in that car on the day she died. He admitted that he shot her but claimed that he had done so only because he believed she was going to shoot him.

Appellant was charged with capital murder for the deaths of Cassity and their unborn child. The jury charge included instructions on the lesser-included offenses of

3

murder, manslaughter, and criminally negligent homicide. It also included an instruction on the defense of necessity. The jury, however, rejected Appellant's necessity defense and found him guilty of capital murder. The trial court entered its judgment on the verdict and assessed Appellant's punishment at the mandatory sentence of life without parole. *See id.* § 12.31(a)(2).

This appeal followed.

## II. Jury Qualifications

In his first issue, Appellant argues that the trial court erred by failing to qualify the jury under Article 35.12 of the Texas Code of Criminal Procedure.

Under Article 35.12, prospective jurors must be asked by the trial court, or under its discretion, whether they are qualified to vote in the county and state, whether they have ever been convicted of theft or any felony, and whether they are under indictment or legal accusation for theft or any felony. Tex. Code Crim. Proc. Ann. art. 35.12(a). A party may challenge a prospective juror who is not a qualified voter, who has been convicted of theft or any felony, or who is legally accused of theft or any felony. *Id.* art. 35.16(a)(1)–(3). When a party challenges a prospective juror who has been either convicted or legally accused of theft or any felony, the trial court must disqualify that juror. *Id.* art. 35.19. Unless the matter was "disputed in the trial court, or unless the record affirmatively shows the contrary," we presume that the jury was properly impaneled. Tex. R. App. P. 44.2(c)(2).

4

Here, the record indicates that during voir dire, the trial court did not ask the prospective jurors the three qualifying questions listed in Article 35.12. After each party questioned the panel and the jurors were chosen, the trial court asked the State and Appellant whether the selected jurors "appear[ed] to be correct," and both parties agreed. Appellant neither challenged any prospective juror on the grounds listed in Article 35.12 nor objected to any of the jurors who were ultimately selected.

Appellant did not dispute the matter of jury qualification in the trial court, and on appeal, he has not pointed to any evidence that the prospective jurors were not properly qualified. *See id.* Citing only the voir dire record "generally," Appellant contends that "the record affirmatively demonstrates the trial court failed to" qualify the prospective jurors. In other words, according to Appellant, the fact that the trial court did not ask the qualifying questions on the record means that it did not happen and that the jury was improperly impaneled.

Contrary to Appellant's contention, there is no requirement under Article 35.12 that the prospective jurors be qualified on the record. *See* Tex. Code Crim. Proc. Ann. art. 35.12. In larger judicial districts, it is standard to ask the qualifying questions of the general jury pool, typically in a central jury room, under the direction of the court *before* the venire members are sent to their respective courts to be impaneled for a specific case. *Carrier v. State*, No. 05-23-00143-CR, 2024 WL 3507198, at *4 (Tex. App.—Dallas July 23, 2024, no pet. h.) (mem. op., not designated for publication); *see* Tex. Gov't Code Ann. § 62.016; *Roise v. State*, 7 S.W.3d 225, 244 (Tex. App.—Austin

5

1999, pet. ref'd). Nothing in the record before us suggests that this procedure was not followed here or that the prospective jurors were not otherwise asked the qualifying questions at some point off the record. *Cf.* Tex. Gov't Code Ann. §§ 62.0132 (mandating juror questionnaire to accompany written jury summons); 62.102 (listing qualifications). Without more, Appellant has failed to overcome the presumption that the jury was properly impaneled. *See Carrier*, 2024 WL 3507198, at *4 (reaching same conclusion in recent appeal raising identical issue of jury qualifications). Indeed, a silent record is not enough to amount to an "affirmative" showing. *Ritchey v. State*, No. 11-20-00035-CR, 2022 WL 3649433, at *2 (Tex. App.—Eastland Aug. 25, 2022, no pet.) (mem. op., not designated for publication); *Hollek v. State*, No. 13-16-00402-CR, 2017 WL 1380525, at *1 (Tex. App.—Corpus Christi–Edinburg, Feb. 2, 2017, no pet.) (mem. op., not designated for publication); *see Osteen v. State*, 642 S.W.2d 169, 171 (Tex. Crim. App. 1982).

We overrule Appellant's first issue.[2]

---

[2]Even if we determined that the trial court had erred by failing to qualify the jury on the record, and assuming that error was preserved, Appellant would still need to show that the error was harmful. *See* Tex. R. App. P. 44.2; *Njogo v. State*, No. 02-18-00245-CR, 2018 WL 6844140, at *2 (Tex. App.—Fort Worth Dec. 31, 2018, no pet.) (mem. op., not designated for publication). To warrant reversal, the record must establish "significant harm" from a known disqualified juror's service. *Njogo*, 2018 WL 6844140, at *2; *see* Tex. Code Crim. Proc. Ann. art. 44.46(2). However, the record does not show that a disqualified juror served in this case, and Appellant neither identifies a disqualified juror nor argues that any of the selected jurors were disqualified.

## III. Evidentiary Sufficiency

In his second issue, Appellant argues that the evidence is sufficient to support a conviction for the lesser-included offense of murder but insufficient to support his capital-murder conviction because (1) the evidence failed to show that Appellant possessed the requisite mental state to murder the unborn child and (2) the evidence did not establish that the unborn child was "alive" at the time of the shooting.

### A. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622; *see* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592,

608 (Tex. Crim. App. 2018). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Id.*

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021).

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021), *cert. denied*, 142 S. Ct. 859 (2022). We must scrutinize circumstantial evidence of intent as stringently as other types of evidence. *Laster v. State*, 275 S.W.3d 512, 519–20 (Tex. Crim. App. 2009). When the record supports conflicting inferences, a reviewing court must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution. *Petetan v. State*, 622 S.W.3d 321, 337 (Tex. Crim. App. 2021).

**B. Capital Murder**

A person commits murder if he intentionally or knowingly causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1). As relevant here, a person commits capital murder if he murders more than one person during the same criminal transaction. *Id.* § 19.03(a)(7)(A). "Person" means an "individual," which is a living human being and includes an unborn child at every stage of gestation from fertilization until birth. *Id.* § 1.07(a)(26), (38).

A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. *Id.* § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). A jury may infer intent or knowledge from any facts that tend to prove its existence, including the acts, words, and conduct of the accused and the method of committing the crime. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

**C. Analysis**

Appellant challenges the sufficiency of the evidence of causation and mens rea. Because the record contains evidence supporting the causation element and Appellant's knowledge of Cassity's pregnancy, which has been held sufficient to support the "knowingly" element of capital murder, we affirm.

## 1. Causation

Appellant contends that "no evidence supports th[e] conclusion" that the unborn child was "alive" when he shot Cassity; therefore, he argues, he did not cause the death of the unborn child.

Contrary to Appellant's contention, there is no evidence that the unborn child's death occurred prior to or independently of Cassity's death. Approximately two weeks before she was murdered, Cassity went to a women's health facility to receive medical care for her pregnancy. Appellant went with Cassity to the appointment. At the appointment, Joy Jenkins, a nurse at the facility, conducted an ultrasound on Cassity. The ultrasound showed the unborn child in Cassity's uterus. Jenkins was able to detect a heartbeat and determined that Cassity was seven weeks pregnant. At trial, Jenkins testified that based on the ultrasound, she had determined that the pregnancy was viable and that, short of something interfering, was expected to continue to term. She explained that nothing about Cassity's pregnancy had suggested otherwise and that she had not anticipated that the pregnancy would end in a miscarriage. When asked about the chances of a pregnancy ending from a miscarriage, Jenkins testified that the risk of miscarriage "drops by half" once gestation becomes a viable uterine pregnancy, as Cassity's pregnancy was before she died. Jenkins also testified that trauma could cause a pregnancy to end. Specifically, a pregnancy may end due to the mother's being shot three times.

Dr. Susan Roe, the medical examiner who conducted Cassity's autopsy, estimated that, based on the unborn child's measurements and maturity, the gestational age was approximately eight to nine weeks. At that gestational age, Dr. Roe was unable to determine the unborn child's sex, and some of the unborn child's intestines were developing outside its abdominal wall. She explained, however, that this was a normal phase of development, describing the unborn child as "normally formed" for its gestational age. Dr. Roe opined that she did not see anything from the autopsy indicating that Cassity's pregnancy had not been viable.

Dr. Roe completed only one autopsy report for both Cassity and her unborn child—instead of two separate reports—per the medical examiner's office's general policy requiring separate reports only after gestational age reaches twenty weeks, but not before. The medical significance of twenty weeks, Dr. Roe explained, is that a fetus is not viable outside of the womb until at least twenty weeks. In a case like Cassity's, then, where the gestational age was only eight to nine weeks, the unborn child was not viable outside of the womb, so it could not survive Cassity's death. Dr. Roe opined that there was no indication that Cassity's pregnancy had been terminated before her death or that the unborn child had died prior to Cassity's death.

Cassity's father testified that the day before she was murdered, Cassity told him that she was pregnant and that Appellant was the unborn child's father.

Appellant himself testified that Cassity was pregnant when he shot her and that "[t]he baby died because [he] shot [her]."

11

The evidence supports a reasonable inference that the unborn child was alive when Appellant shot and killed Cassity. The State was not required to disprove all reasonable alternative hypotheses that might be inconsistent with Appellant's guilt for the evidence to be sufficient to support his conviction. *See Greco v. State*, No. 02-19-00383-CR, 2021 WL 3557041, at *13 & n.17 (Tex. App.—Fort Worth Aug. 12, 2021, no pet.) (mem. op., not designated for publication) (first citing *Jones v. State*, No. 01-14-00385-CR, 2015 WL 4591745, at *6 (Tex. App.—Houston [1st Dist.] July 30, 2015, no pet.) (mem. op., not designated for publication); and then citing *Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999)).[3] Viewed in the light most favorable to the verdict, the evidence is sufficient to support the causation element of Appellant's capital-murder conviction.

### 2. Mens Rea

Appellant contends that the evidence "does not allow the conclusion that [he] knowingly or intentionally caused the death of the unborn child." While he admits that he knowingly or intentionally murdered Cassity, he argues that killing a pregnant woman does not always result in the death of the unborn child because "there are instances where a viable fetus is born after a mother has died." He does not, however,

---

[3]Pointing to (1) the evidence of the unborn child's early stage of development, including the inability to determine sex and the intestines' position outside the abdominal wall; (2) the testimony that there had been at least some risk of miscarriage; and (3) the lack of information, according to Appellant, about the unborn child's health on the day of the murder, Appellant asserts that the jury could only speculate as to whether the unborn child was alive on the day Cassity died. For the foregoing reasons, we reject Appellant's assertion.

expand on this argument or otherwise explain which "instances," if any, would be relevant here, nor does he cite any supporting legal authority. *See* Tex. R. App. P. 38.1(i).

Appellant was aware that Cassity was pregnant. Approximately two weeks before he shot her, Appellant went with Cassity to her ultrasound appointment and saw a clip of the ultrasound showing their unborn child. At trial, he testified several times that he knew that Cassity was pregnant. Then, on cross-examination, the State asked Appellant, "The baby died because you shot Cassity, correct? . . . [B]ecause when you shoot the mom, the baby is going to die?" Appellant answered, "Yes." He acknowledged that he knew Cassity was nine weeks pregnant when he shot her and that he knew she would die when he shot her.

The evidence demonstrates that Appellant knew that Cassity was pregnant when he shot her and then fled from the scene, that he intentionally or knowingly caused her death, and that their unborn child died as a result of Cassity's death. The jury could reasonably infer from this evidence that Appellant was aware that shooting a pregnant woman three times in her neck and then leaving her to die on the side of the highway was reasonably certain to cause the unborn child's death. *See Estrada v. State*, 313 S.W.3d 274, 305 (Tex. Crim. App. 2010); *Greco*, 2021 WL 3557041, at *14; *Eguia v. State*, 288 S.W.3d 1, 8–10 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Viewed in the light most favorable to the verdict, the evidence is sufficient to support the mens rea element of Appellant's capital-murder conviction.

We overrule Appellant's second issue.

## IV. Conclusion

Having overruled both of Appellant's issues, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: October 3, 2024