

# NUMBER 13-08-00490-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

NELSON GARCIA DELGADO,                                          Appellant,

v.

THE STATE OF TEXAS,                                            Appellee.

### On appeal from the 332nd District Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Perkes
Memorandum Opinion by Justice Perkes**

Appellant, Nelson Garcia Delgado, appeals his capital-murder conviction for murdering Claudia Lorena Zamora and her unborn child during the same criminal transaction. He contends: (1) the trial evidence was legally insufficient to show he intentionally or knowingly killed the unborn child; and (2) the trial court erred when it denied his request for a lesser-included-offense instruction on manslaughter. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At the time of the murders, appellant and Zamora, had been dating for several months and appellant was living with Zamora and her two children from a prior relationship. Appellant and Zamora knew Zamora was about three months pregnant with their child. In the weeks leading up to the murders, their relationship was troubled, and Zamora had confronted appellant about whether he was seeing other women. The Saturday night before the murders, Zamora and her two young sons followed appellant to a disco where Zamora saw him leave with another woman. Later, Zamora told her sons she was thinking of leaving appellant. She took them to their father's house and after visiting with a friend, she met appellant at their apartment shortly after midnight on Monday, the day of the murders.

Appellant gave the Edinburg police three recorded statements which were admitted in evidence at trial: two audio statements given in the hospital on the day of the murders and one video statement given at an Edinburg Police office on the day after the murders. Appellant did not testify at trial.[1]

According to appellant, he and Zamora started arguing at about half past midnight. In his statements, appellant admitted he was a "woman chaser" and that shortly before he

---

[1] Outside the presence of the jury, appellant stated under oath on the record that he decided voluntarily not to testify at trial.

strangled her, Zamora had confronted him about leaving the disco with the other woman. In his video statement, appellant said he became very angry when Zamora confronted him about the other woman. Appellant also claimed that during the argument, Zamora angrily entered the bathroom and after about "one minute" emerged from the bathroom and showed him something bloody and slimy, and said "I took it out." According to appellant, Zamora then returned to the bathroom and he heard the toilet flush. He also said Zamora told him she was in great pain from removing his "cynicism from her womb." Appellant said in his statements that he believed it was their unborn child and that Zamora had removed it from her body and then flushed it down the toilet. Appellant said this provoked him to call Zamora a "murderer" and punch her twice and then strangle her. Appellant said he held her neck in an arm hold, for what he believes was thirty seconds. In his first recorded statement given to police in the hospital, appellant told police that after he squeezed Zamora's neck, because of her "loss of, of [sic] her mind," he "took her into the car . . . and closed the door." In this statement, he said Zamora "wasn't coming around" and "did not move" at this time.

The evidence shows that after drinking some juice in the kitchen, appellant dragged Zamora's body to his car and staged a car accident to cover up the murders. In his statements, appellant alternated between saying Zamora "lost consciousness" or "fainted" during the choking, and saying that she was gasping and still able to walk some with his assistance even after he choked her. When police found her body in the car, Zamora's hair and clothing were wet. Appellant's explanation for Zamora's wet hair and clothing is that he slipped en route to the car, causing Zamora to fall into a collapsed above-ground pool. At various points in his statements, even when claiming Zamora

3

was still gasping and conscious, the language appellant used showed he "put" her in the car because she was not conscious. For example, appellant said that while inside the car, he pulled Zamora's dress down for her, "sat her down," and decided whether to buckle her seatbelt. Appellant did not complain during the interview at the police office when a police officer used the phrase, "when you dragged her to the car." Police found drag marks in the dirt outside the apartment, and Zamora's body had grass and other similar debris on it. Her dress and brassiere were bunched up around the chest, consistent with dragging. Appellant said he lifted her from the back underneath her arms.

At about 3:45 a.m., Edinburg police responded to an apparent one-car auto accident on Highway 281 in Hidalgo, County. Traffic was light. Appellant had crashed his car into a hollow, striped plastic barrier, near an exit ramp. There was only minor front-end damage to appellant's car. The airbags did not deploy. There were no skid marks on the road, and the only debris at the scene was the front license plate of appellant's car.

Zamora's body was in the front passenger seat. She was not wearing a seatbelt and had slid partially off of the seat onto the floor. Her back rested on the seat of the chair, and her legs rested on the floor. Responding officers noticed Zamora had no purse, identification, or shoes. She was not wearing a safety belt and the pooling of blood under her skin indicated to them she had died some time ago; before the car accident. Zamora's dress was soaking wet, and her hair was also wet. There was no evidence that her body struck the dashboard during the collision. There was no external injury or bleeding on Zamora that would suggest she was injured in the collision.

4

Appellant was found slumped over the steering wheel drooling, but not bleeding or visibly injured.   Appellant was wearing his seatbelt.   He did not respond to officers, but officers at the scene noticed the car was in "park" when they arrived and found this unusual.   The officers concluded it was an intentional auto collision.

Appellant was taken to the emergency room at the McAllen Medical Center.   At about 8:30 a.m., appellant was admitted to a critical care unit from the emergency room because he was unresponsive.   Trial testimony showed that at the hospital, no medical explanation could be found for appellant's lack of responsiveness.   Appellant suffered no serious injuries.   Investigator Oziel Plata of the Edinburg Police Department testified based on his observations of appellant at the hospital that appellant was probably just acting unconscious.   Both the lead nurse who cared for him after his transfer to critical care and Investigator Daniel Ochoa of the Edinburg Police Department concluded appellant was malingering a loss of consciousness.

Appellant was intubated and appeared unconscious, but when the nurse began a routine suction procedure to remove mucus produced by the lungs, appellant became combative and aggressive.   The nurse testified that normally, an unresponsive patient remains unresponsive during suction.   Ochoa and Plata were in the hospital room when evidence samples were extracted from appellant.   Ochoa and Plata both noticed that appellant's body tensed up in anticipation when a person approached appellant to take a pubic-hair sample.   After collection of the sample, Ochoa watched appellant from outside the hospital room and saw him open his eye occasionally.   More than once, Ochoa also noticed a tear drop coming from appellant's eye.   Later, after the breathing tube was

5

removed and appellant agreed to talk to Ochoa at the hospital, appellant asked Ochoa whether he killed Zamora or whether Zamora died in the car wreck.

An autopsy revealed Zamora died of asphyxiation by strangulation before appellant placed her body in the car. Post-mortem medical examination of Zamora revealed no evidence of miscarriage or attempted abortion. There was no blood or other evidence of attempted abortion in the apartment. The unborn child was normal and healthy, with a healthy placenta and amniotic sac in place. The autopsy revealed the unborn child died because the mother died, and the forensic pathologist who performed the autopsies testified the unborn child would have died within about a minute of the mother's death due to lack of oxygen.

A jury found appellant guilty of capital murder, and the trial court sentenced him to life imprisonment without parole in the Institutional Division of the Texas Department of Criminal Justice. This appeal followed.

## II. DISCUSSION

### A. Is the Evidence Legally Sufficient to Support Appellant's Conviction?

By his first issue, appellant argues the evidence the State presented at trial is legally insufficient to show he intentionally or knowingly caused the death of the unborn child.[2] Appellant emphasizes there is no evidence of trauma to the mother's abdomen and the autopsy of the unborn child revealed the child was healthy and normal. In making his argument, appellant does not limit himself to a no-evidence complaint, but

---

[2] At least once in his brief, appellant complains the State did not prove he "intentionally *and* knowingly" caused the death of the unborn child (emphasis added). As demonstrated below in this opinion, under the applicable legal standard, the State was not required to prove both mental states. Appellant cites the correct legal standard in his brief. We do not treat appellant's occasional use of the conjunctive rather than the disjunctive as an issue on appeal because appellant has not included argument or citation to legal authority in support of any contention that the State was required to prove both mental states. *See* TEX. R. APP. P. 38.1(i).

6

also contends the evidence presented at trial affirmatively refutes the State's contention he intended to murder the unborn child. As a result, in its response brief, the State addressed the legal and factual sufficiency of the evidence to show appellant's intent to cause the death of the unborn child, though appellant did not designate or brief the factual sufficiency of the evidence as a separate issue.

### 1. Standard of Review for Legal Sufficiency

The Texas Court of Criminal Appeals has determined that "the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State,* 323 S.W.3d 893, 894 (Tex. Crim. App. 2010) (plurality op.). Thus, we do not refer separately to legal or factual sufficiency and we will review the evidence under the *Jackson v. Virginia* standard as summarized below.

Evidence is insufficient if, when viewed in a light most favorable to the verdict, a rational jury could not have found each element of the offense beyond a reasonable doubt. *Wesbrook v. State,* 29 S.W.3d 103, 111 (Tex. Crim. App. 2000) (citing *Jackson v. Virginia,* 443 U.S. 307 (1979)). In evaluating a legal-sufficiency challenge, we consider all of the evidence and view it in the light most favorable to the verdict. *Jackson*, 443 U.S. at 319. The issue on appeal is not whether we, as a court, believe the State's evidence or believe that appellant's evidence outweighs the State's evidence. *Wicker v. State,* 667 S.W.2d 137, 143 (Tex. Crim. App. 1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson v. State,* 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). The trier of fact is the sole judge of

7

the credibility of the witnesses and of the strength of the evidence. *Fuentes v. State,* 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). The trier of fact may choose to believe or disbelieve any portion of the witnesses' testimony. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). When faced with conflicting evidence, we presume the trier of fact resolved conflicts in favor of the prevailing party. *Turro v. State,* 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). Therefore, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State,* 939 S.W.2d 607, 614 (Tex. Crim. App. 1997) (citing *Jackson*, 443 U.S. at 319).

### 2. The Elements of Capital Murder in this Case

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State,* 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State,* 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof, or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* A person commits capital murder when he "murders more than one person . . . during the same criminal transaction." TEX. PENAL CODE ANN. § 19.03(a)(7)(A) (West 2003). A person commits murder if he "intentionally or knowingly causes the death of an individual." *Id.* § 19.02(b)(1). "A person acts intentionally with respect to . . . a result of his conduct when it is his conscious objective or desire to . . . cause the result." *Id.* § 6.03(a) (West 2003). "A person acts knowingly . . . with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b).

"'Person' means an individual . . ." and '[i]ndividual' means "a human being who is alive, including an unborn child at every stage of gestation from fertilization until birth." *Id.* § 1.07(a)(26), (38) (West 2003). Under the Texas Penal Code, "'[d]eath' includes, for an individual who is an unborn child, the failure to be born alive." *Id.* § 1.07(a)(49). It follows from these provisions that a person who intentionally or knowingly causes the death of a woman and her unborn child, at any stage of gestation, commits capital murder. *Lawrence v. State,* 240 S.W.3d 912, 915 (Tex. Crim. App. 2007).

### 3. The Legal Sufficiency of the Evidence

Viewing the evidence in the record in the light most favorable to the jury's verdict, it is sufficient to prove beyond a reasonable doubt that appellant intentionally or knowingly caused the death of the unborn child. Evidence of injury to the mother's abdomen is not necessary to prove appellant intentionally or knowingly killed the unborn child. *See Estrada v. State*, 313 S.W.3d 274, 279 & 305 (Tex. Crim. App. 2010) (finding evidence sufficient to sustain capital-murder conviction because defendant knew complainant was pregnant and even though he did not stab unborn child, "a jury could reasonably infer" defendant was aware that strangling a pregnant woman and stabbing her back, neck, and head a total of thirteen times was reasonably certain to kill the unborn child); *Eguia v. State*, 288 S.W.3d 1, 9 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (finding evidence sufficient to sustain capital-murder conviction in the absence of abdominal injury to mother, when mother was visibly in later stages of pregnancy and defendant stabbed her neck, causing mother to die of blood loss).

In this case, the medical evidence showed appellant caused the death of Zamora in a way from which a jury could rationally infer he intentionally or knowingly caused the

9

death of her unborn child.   *See Estrada*, 313 S.W.3d at 305.   The forensic pathologist who performed the autopsy on Zamora testified at trial that Zamora suffered no serious injury in the auto collision.   The forensic pathologist testified further that Zamora died of asphyxia by strangulation and that she would have died after being strangled for about fifteen seconds.   Bruising and lacerations inside Zamora's mouth under her lip, including apparent outlines made by Zamora's teeth, suggested to the forensic pathologist that someone held his hand over Zamora's mouth with force.   Based on the medical evidence, including the petite stature of Zamora and the extent of internal hemorrhaging in the neck area, the forensic pathologist testified that the person who strangled Zamora could not have done so accidentally because it would have been obvious from Zamora's face that she was dying.   The forensic pathologist testified that after a person is strangled in this manner, they will collapse dead.   She testified Zamora's unborn child would have died within approximately one minute of Zamora's death due to lack of oxygen.

Appellant stated he grabbed Zamora's neck from behind and then squeezed with his arm while "like facing her by her side."   The record shows Zamora was five feet tall and appellant is five feet, nine inches tall.   In his various statements admitted in evidence at trial, appellant stated he "grabbed her like a – a gladiator," "squeezed" her neck, and "felt like she would die."   On video admitted in evidence, appellant demonstrated on a police investigator's neck how he held her neck in an arm hold and stated he believed he held her in this position for about thirty seconds.   Appellant stated he did not recall Zamora shouting or making any sounds, but while he was holding her neck she lost consciousness or fainted because of lack of oxygen.   Appellant said Zamora fell down after he released her neck.

10

In addition, circumstantial evidence indicating a consciousness of guilt also showed appellant's intent to murder Zamora's unborn child. *See Eguia*, 288 S.W.3d at 9 (finding intent to kill unborn child from circumstantial evidence). Circumstantial evidence must often be used to prove intent because the intent of the accused is concealed within his own mind and can only be determined from his words, acts, and conduct. *Smith v. State,* 965 S.W.2d 509, 518 (Tex. Crim. App.1998). Circumstantial evidence indicating a consciousness of guilt, such as false statements about the crime or an attempt to cover it up, are relevant to show intent. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000); *Torres v. State*, 794 S.W.2d 596, 598–600 (Tex. App.—Austin 1990, no pet.). "A 'consciousness of guilt' is perhaps one of the strongest kinds of evidence of guilt." *Hyde v. State*, 846 S.W.2d 503, 505 (Tex. App.—Corpus Christi 1993, pet. ref'd.) (quoting *Torres*, 794 S.W.2d at 598). "It is consequently a well accepted principle that any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a 'consciousness of guilt' may be received as a circumstance tending to prove that he committed the act with which he is charged." *Torres*, 794 S.W.2d at 598 (internal quotations omitted).

A criminal defendant's post-incident statements about how a child was injured can indicate a consciousness of guilt, especially when the statements are grossly inconsistent with the medical findings. *See Baldwin v. State*, 264 S.W.3d 237, 242-43 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) (inferring defendant intentionally caused injury from defendant's failure to render aid and defendant's efforts to conceal the cause of injury); *Barcenes v. State,* 940 S.W.2d 739, 745 (Tex. App.—San Antonio 1997, pet. ref'd) (holding evidence that appellant tried to cover up his actions and expert medical

11

testimony discrediting appellant's explanation of injuries was sufficient to sustain murder conviction).   Likewise, a criminal defendant's "changing story" about the crime and surrounding circumstances can show intent.   *See Couchman v. State*, 3 S.W.3d 155, 163–64 (Tex. App.—Fort Worth 1993, pet. ref'd).

Viewing the evidence in the light most favorable to the verdict, a rational jury could have found appellant lied in his statements about the cause and time of the unborn child's death.   In his statements, appellant said that before he strangled Zamora, she showed him what he believed to be their aborted child, but the medical evidence showed no evidence of abortion or miscarriage and there was no blood in the bathroom where appellant said the self-performed abortion occurred.   Appellant further revealed he knew the child was dead when he gave his first statements to the police at the hospital, just hours after the car wreck, when he tried to blame the unborn child's death on Zamora. Based on the foregoing, the jury acted within its province to disbelieve appellant's version of the events.   *See Turro*, 867 S.W.2d at 47; *Sharp*, 707 S.W.2d at 614.

The staged car wreck is also circumstantial evidence that appellant intentionally or knowingly caused the death of Zamora's unborn child.   Rather than seeking medical help for Zamora or the unborn child, appellant put the unborn child through a car wreck.[3] When asked why he took Zamora to the car after strangling her, appellant offered no answer other than to describe that his mind was blank and he could not make a decision. Appellant's statements about Zamora's condition when he took her to the car were inconsistent.   In his first recorded account, he said he "took her into the car" and she

---

[3]   At trial, the forensic pathologist testified that generally a car wreck is highly likely to cause trauma to an unborn child, and often causes miscarriage, though in this case, the unborn child was not injured in the car wreck.

12

"didn't move" and she was not "coming around." In his subsequent statements, appellant said Zamora walked to the car with his assistance and she was gasping for air on her way to the car and inside the car.

Under either account, Zamora's condition was grave and appellant did not seek medical help for the unborn child. When asked if he considered taking Zamora to a hospital, he answered "Eh?" and when asked if he considered seeking a doctor, he said he could not make a decision. He said he considered strapping Zamora's seatbelt, but he did not do so though he wore his seatbelt during the drive. Viewing the evidence in the light most favorable to the verdict, we hold the evidence is legally sufficient to prove appellant intentionally or knowingly caused the death of Zamora's unborn child. *See Estrada*, 313 S.W.3d at 305; *Baldwin*, 264 S.W.3d at 242-43; *Barcenes*, 940 S.W.2d at 745. Accordingly, we overrule appellant's first issue.

## B. Did the Trial Court Err in Denying Appellant's Requested Lesser-Included-Offense Instruction on Manslaughter?

By his second issue, appellant argues the trial court erred reversibly when it denied his request for a jury instruction on manslaughter as a lesser-included offense of capital murder. The record shows the trial court instructed the jury on murder as a lesser-included offense, but denied Appellant's request for a manslaughter instruction. Appellant argues the evidence supported a manslaughter instruction because his statements to the police and the forensic pathologist's testimony showed he acted recklessly rather than with intent to kill Zamora and her unborn child. In his brief, appellant characterizes his statements to the police as a denial of intent to kill Zamora and the unborn child and as saying he acted merely to scare Zamora because she had told him she had just aborted the unborn child. Although appellant claims the forensic

13

pathologist's testimony supports his argument that his actions were only reckless, he does not refer to any particular testimony in the record or state how her testimony supports his argument. As described below in greater detail, having reviewed the forensic pathologist's testimony, we find no support in her testimony for appellant's argument that his actions were reckless.

### 1. Standard of Review for Lesser-Included-Offense Instruction

To determine whether an offense is a lesser-included offense of the charged offense, we perform a two-step analysis. The first step is a question of law. We compare the statutory elements of the greater offense as they were modified by the particular factual allegations in the indictment with the elements of the lesser offense that could be included in that greater offense, to determine if the lesser offense meets the statutory definition of a lesser-included offense. *Hall v. State*, 225 S.W.3d 524, 535-36 (Tex. Crim. App. 2007). If the outcome of step one is affirmative, a lesser-included-offense instruction may be warranted depending on the outcome of the second step of the analysis. *See id.*

In step two of the analysis, we determine whether there is some evidence in the record that would permit a jury to rationally find that if the defendant is guilty, he is guilty only of the lesser-included offense. *Id.* at 536 (citing *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994)). While anything more than a scintilla of relevant evidence is sufficient to entitle the defendant to the instruction, the evidence must establish the lesser-included offense as a "valid, rational alternative to the charged offense" or the defendant will not be entitled to the instruction. *Wesbrook*, 29 S.W.3d at 113; *Bignall*, 887 S.W.2d at 23. To be entitled to the instruction, it is insufficient that the jury may

14

disbelieve crucial evidence pertaining to the greater offense, but rather, there must be some evidence directly germane to the lesser-included offense for the jury to consider before an instruction on a lesser-included offense is warranted. *Hampton v. State*, 109 S.W.3d 664, 671 (Tex. Crim. App. 2003). In making the determination under step two, this court should review all the trial evidence. *Bignall*, 887 S.W.2d at 23. The credibility of the evidence and whether it conflicts with other evidence or is controverted may not be considered in determining whether an instruction on a lesser-included offense should be given. *Smith v. State*, 297 S.W.3d 260, 275 (Tex. Crim. App. 2009).

### 2. Appellant Was Not Entitled to a Manslaughter Instruction

As shown below, manslaughter is a lesser-included offense of capital murder under the first step; however, the evidence does not raise the issue of manslaughter.

By statute, an offense may be a lesser-included offense if:

(1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4) it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX. CODE CRIM. PROC. ANN. art. 37.09 (West 2006). In this case, the pertinent inquiry under step one is whether manslaughter differs from capital murder as charged in the indictment only in the respect that a less culpable mental state suffices to establish its commission. *See Pierce v. State*, 234 S.W.3d 265, 269–70 (Tex. App.—Waco 2007, pet. ref'd) (applying *Hall* to determine whether lesser offense differed from charged

15

offense only in respect of requiring a less culpable mental state).  This is the only argument for the lesser-included offense that appellant raises on appeal.

The indictment alleged capital murder with the following elements:

(1)     the appellant;

(2)     intentionally or knowingly;

(3)     caused the death of Claudia Lorena Zamora, by choking her with his arm; and

(4)     during the same criminal transaction appellant did then and there intentionally or knowingly cause the death of another individual, to-wit: an unborn child of Claudia Lorena Zamora, while said unborn child was in gestation in Claudia Lorena Zamora, by choking Claudia Lorena Zamora with his arm.

In a separate paragraph, the indictment alleged the same elements, except that appellant choked Claudia Lorena Zamora with his hand (instead of his arm).  Manslaughter is defined as recklessly causing the death of an individual.  TEX. PENAL CODE ANN. § 19.04(a) (West 2003).  Recklessly is defined as follows:

A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.* § 6.03(c) (West 2003).  Because manslaughter and capital murder as charged in the indictment differ only in respect that a less culpable mental state suffices to establish manslaughter, we conclude that manslaughter is a lesser-included offense of capital murder as charged in the indictment.  *See* TEX. CODE CRIM. PROC. ANN. art. 37.09 (West 2006); *Hall*, 225 S.W.3d at 536–37; *Pierce*, 234 S.W.3d. at 270–71.  In other words, step one of the analysis is satisfied.

16

The question presented under step two is whether appellant's statements that he intended to scare Zamora and that he did not intend to kill Zamora, are evidence he is guilty only of the lesser-included offense of manslaughter as to both Zamora and her unborn child. *See Cardenas v. State*, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000) (analyzing whether defendant's statements entitled him to a manslaughter instruction in a capital-murder trial).

Murder is defined as intentionally or knowingly causing the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2003). A person acts intentionally with respect to "a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (West 2003). A person acts knowingly "with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* §6.03(b).

To raise the issue of manslaughter, the trial record must contain evidence of lack of intent to kill and evidence that appellant acted recklessly. *Mays v. State*, 318 S.W.3d 368, 387 (Tex. Crim. App. 2010) (citing *Burnett v. State*, 865 S.W.2d 223, 229 (Tex. App.—San Antonio 1993, pet. ref'd.)); *Arnold v. State*, 234 S.W.3d 664, 673 (Tex. App.—Houston [14th Dist.] 2007, no pet.). In other words, there must be affirmative evidence in the record as to Zamora and her unborn child, respectively, that during the thirty seconds that appellant squeezed Zamora's neck in an arm hold, (1) he did not intend to cause death or know that death was reasonably certain to occur; and (2) he consciously disregarded the risk that he would cause death. *See Mays*, 318 S.W.3d at 387. On the record in this case, appellant cannot make either showing.

17

The English-language transcripts of appellant's three statements span approximately eighty-five pages of the reporter's record on appeal. Once in those statements, appellant stated "and it was like to scare her . . . ." Twice in those statements, appellant denied he intended to kill Zamora, in one case adding that "[i]t was the rage . . . ." Several times in his statements, appellant said he acted out of "rage" or "went mad." Many times, he said he did not think he killed Zamora—speaking of his post-incident belief about what happened as opposed to commenting on his mental state at the time he strangled Zamora. At least five times in his second and third statements combined, appellant said he wanted to die and he said he wished Zamora's family would come kill him. In all three of the statements, appellant described how he and Zamora argued just before the murders, claiming in each statement that Zamora provoked him by showing him something he believed to be their aborted child, and indicating she had removed the child from her womb. In each statement, appellant denied any recollection of the car crash, and claimed to have first learned of it from Detective Ochoa, the officer who first interviewed appellant at the hospital. As summarized below, each statement contained some unique information not common to the other two statements.

### a. Appellant's First Recorded Statement

In appellant's first recorded statement about how Zamora died, appellant essentially admitted he killed Zamora. Specifically, appellant said that after Zamora told him she had just aborted his son and showed him what he believed to be his aborted child, he squeezed her neck, she "fainted" and then "because of her loss of, of her mind" he "took her into the car" and she "didn't move" and she was not "coming around." Then, appellant asked Detective Ochoa, who was interviewing him, if he had killed Zamora. At

18

this time, Ochoa answered that the facts were under investigation and appellant responded he could not recall how the car crash happened, but said he recalled that he "grabbed her by the neck, but, not to kill her." Ochoa responded that perhaps it was a moment of rage or perhaps appellant went too far. Once more, appellant denied intent to kill Zamora:

Appellant:    I grabbed her by her neck, but not to kill her.

Ochoa:        No, you didn't mean to kill her.

Appellant:    It was the rage, but . . . .

(ellipses in the original). After this exchange, appellant then said that after he strangled Zamora, she "went very slowly" to the car without being carried. Very shortly after making this statement, appellant asked Ochoa whether he killed Zamora or she died in the car crash.

### b.    Appellant's Second Recorded Statement

In his second recorded statement concerning his argument with Zamora, appellant added that after he heard the toilet flush and Zamora exited the bathroom, he told her, "You are a murderer," and then he "grabbed her neck" and "squeezed." In this statement, appellant maintained that after he choked Zamora, she was able to walk to the car with his assistance and she was gasping for air. In this statement, appellant did not deny that he intended to kill her at the time he choked her. Rather, he said multiple times, "I don't believe I killed her" and "I don't think I killed her." When told that Zamora died of asphyxia, appellant responded, "I overdid it," and then answered questions about Zamora's lack of underwear and provided information about Zamora's children and prior relationship. Toward the end of the statement, Ochoa told appellant that he believed

19

Zamora was dead before appellant took her to the car and appellant responded with a brief description of his mental state at the time he choked Zamora. Appellant's description does not show that he lacked intent to kill or consciously disregarded a risk that he would cause Zamora or the unborn child's death by squeezing her neck:

Ochoa: Well, I honestly think that she died before you took her to the car.

Appellant: Before I took her to the car? But she was like, she like breath [sic] . . . breathing.

Ochoa: Well, those must've been her last gasps, or something, I don't know. And there . . . You know?

Appellant: And there, I told her, look!

. . .

Appellant: I tell you . . . this question about . . . and about what you say.

Ochoa: OK [sic]

Appellant: I know I lost my head. I'm in trouble. I, my head, can't take it anymore. She took out my son and from there we go on, disappeared.

Ochoa: Yes, obviously, that's what happened. You went too far. You admit it?

Appellant: Yes.

### c. Appellant's Third Statement – A Video Statement

In his video statement given at an Edinburg police office the day after the murders, appellant volunteered more background information on the relationship problems he and Zamora experienced in the time leading up to Zamora's death. He spoke about how Zamora controlled his phone and had confronted him about women's phone numbers she had discovered on his phone. He also volunteered that Zamora's "belly" had become

20

"huge" within three months and that prior to the night of the murders, he had asked Zamora if she was "going to have an abortion," to which he said she answered, "No, no." According to appellant's description, people were starting to comment on Zamora's belly.

Next, appellant described how the Saturday night before the murders he left the apartment, went to a disco where he met another woman, and then went to that woman's apartment. Appellant did not know until just before the murders that Zamora had followed him to the disco. In his video statement he admitted he became "very angry" when Zamora confronted him about seeing another girl. He added that at this point, Zamora was furious and entered the bathroom alone with the door closed for about "one minute" and performed what he believed to be an abortion. He said that he then lost his mind:

> And then my mind was not mine. Truly, I tell you. My mind went blank. And she came. She placed herself . . . in . . . like turning her back on me. And that was when I grasped her by her neck. I went mad. However, I've never thought that I may . . . she . . . I tell you. When suddenly, she . . . like . . . apparently she lost consciousness. And when I touched her here, she did like . . . argh . . . argh . . .¿No? And she walked a little with . . . with me towards here, I was supporting her. Did you hear? But from her back. And then, I took . . . I took the car . . . I was already mad. I already don't know . . . I already did not know what I was going to do. I wanted to kill myself. Because when I was in the car, I, I was touching her, I was calling her, she did not answer me. I don't know whether she died inside the car when I was touching her. I was like a . . . You know? I don't know when she blacked out, when she passed away. At that moment I wanted to kill myself.

(ellipses in original). Appellant described that during the argument, Zamora told him that the unborn child was not his child and that she had removed it from her body. Appellant said it was the latter that made him angry and he then demonstrated on video, using Detective Ochoa's neck, how he held Zamora's neck in an arm hold. Appellant stated he believes he squeezed her neck in this position for thirty seconds, during which time he did

21

not hear Zamora make any sounds. Appellant said he "noticed" that Zamora then "lost consciousness, [sic] because of lack of oxygen."

In this statement, appellant said Zamora was "not walking," but was walking with his help to the car because he "hit her too much." He added that his help consisted of "carrying" Zamora to the car. In this statement, appellant also said Zamora was alive and gasping for air in the car. When Detective Trevino of the Edinburg Police Department asked, appellant denied he accidentally killed Zamora, adding "[a]nd it was like to scare her:"

> Trevino: Then, you are saying that yes, you did *strangle* her too much, and yes she died because of that . . . how . . . did you strangle her? You are saying it wasn't . . . Was it really an accident?
>
> Appellant: No, no, no. I did it. Do you understand? But, I don't think I went that far.
>
> Trevino: OK. [sic]
>
> Appellant: It was like, like what she did to me . . . What she said to me. What she did to me about my son.
>
> Trevino: OK. [sic]
>
> Appellant: Do you understand? That it was my head, that was blocked.
>
> Trevino: OK. [sic]
>
> Appellant: And it was like to scare her. But honestly, I'm going to be straight with you. Maybe she died because of what I did to her. She died a little bit later, a little bit in the car. Do you know what I mean? Because maybe, we wounded her, ah very deep, or maybe not. Maybe, I don't (sic) know what to tell you. But, yes, my head went crazy. Yes, and I . . . wasn't myself. I am not myself now.

(all ellipses in original). Appellant stated he was enraged and described how after he strangled her, he and Zamora fell into a collapsed above-ground pool en route to his car.

22

At this point in the statement, appellant said Zamora was walking and holding on to him as they walked to his car. He said he slipped in the pool, causing both of them to fall in the pool which made Zamora wet. He also stated that he and Zamora were alone in the apartment when he strangled her.

### d. Why the Evidence Does Not Raise the Issue of Manslaughter

At a minimum, there is no affirmative evidence in the record that appellant did not know the death of Zamora and her unborn child were reasonably certain to occur when he strangled Zamora. Appellant's statements denying intent to kill cannot be plucked out of the record and considered in isolation and out of context. *See Ramos v. State*, 865 S.W.2d 463, 465 (Tex. Crim. App. 1993); *Arnold*, 234 S.W.3d at 671-72 (citing *Godsey v. State*, 719 S.W.2d 578, 584 (Tex. Crim. App. 1986)). In *Cardenas*, the Court of Criminal Appeals addressed whether a capital-murder defendant's statements that he 'lost it' and did not intend to hit the victim so hard entitled him to a jury instruction on manslaughter as a lesser-included offense. *Cardenas*, 30 S.W.3d at 392-93. The court found that "[g]iven the number of blows, severity of the injuries, and particularly the evidence that the victim was also strangled with the towel, appellant's statement that he 'lost it' and did not realize how hard he hit the victim does not negate the physical evidence showing an intent to kill." *Id.* at 393. In its analysis, the court emphasized that the forensic pathologist who testified at trial determined that the cause of the victim's death was asphyxiation by a ligature, consistent with a towel found around the victim's neck and blows to the neck inflicted with such force that the victim's airways were "completely obstructed." *Id.*

23

As in *Cardenas*, the forensic pathologist's testimony is clear that Zamora died by an intentional or at least knowing act of strangulation. *See id.* As summarized above under the legal-sufficiency analysis, appellant's own description of his acts and the circumstantial evidence tending to show consciousness of guilt show he intentionally or knowingly caused the death of both Zamora and her unborn child. When considered in context and in light of all the evidence in the record, appellant's statements do not amount to evidence that he is guilty only of manslaughter. *See Mathis v. State*, 67 S.W.3d 918, 925–26 (Tex. Crim. App. 2002); *Cardenas*, 30 S.W. 3d at 393; *Arnold*, 234 S.W.3d at 671–72. Appellant fails to point to any evidence in the trial record that affirmatively shows that while he strangled Zamora, he was reckless about the likelihood the deaths would occur. *See Mays*, 318 S.W.3d at 387.

Considering all the evidence in the record, including the evidence that appellant intentionally or knowingly caused the death of Zamora and her unborn child and the absence of affirmative evidence of recklessness, appellant's isolated statements that he acted to scare Zamora and did not intend to kill, do not constitute evidence upon which a jury could rationally find that appellant's actions were only reckless. *See id.* Accordingly, we hold that under the facts of this case, appellant was not entitled to an instruction on manslaughter as a lesser-included offense of capital murder. Appellant's second issue is overruled.

24

### III. CONCLUSION

The evidence in this case is legally sufficient to show appellant intended to cause the death of Zamora's unborn child. The evidence also shows that under the facts of this case, appellant was not entitled to a jury instruction on manslaughter as a lesser-included offense of capital murder. Having overruled both of appellant's issues on appeal, we affirm the trial court's judgment.

_____
Gregory T. Perkes
Justice

Do not publish. TEX. R. APP. P. 47.2(b).

Delivered and filed the
7th day of April, 2011.